CANADY, J.,
dissenting.
I dissent from the majority’s decision to vacate Roy Clifton Swafford’s convictions and sentences for first-degree murder and sexual battery. Swafford’s motion for postconviction relief is based on the 2004 retesting for acid phosphatase of vaginal and anal swabs collected in 1982 from the victim’s body. The majority concludes that the 2004 test results — showing the absence of acid phosphatase — demonstrate that the victim was not sexually battered. On that basis, the majority determines that Swafford’s convictions must be vacated. This result is without any factual or legal justification.
Based on the evidence presented in the postconviction proceedings, the probative significance of the '2004 acid phosphatase test results is nil. The evidence indisputably shows that the 2004 retest of the material collected in 1982 cannot be considered a reliable indication of the absence of acid phosphatase in 1982. But even if the 2004 test results could be considered valid, those results would not have significant probative value. Reliance on the 2004 test results to overturn Swafford’s convictions is a transparent veil the majority casts over its revisiting of discrete issues that previously were adjudicated adversely to Swafford by this Court and that are now — in these proceedings related to Swafford’s fourth postconviction motion— procedurally barred. This is not the way the postconviction process should work.
As the postconviction court determined, Swafford did not satisfy the second prong of the newly discovered evidence standard. The newly discovered forensic evidence neither “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability,” Jones v. State (Jones II), 709 So.2d 512, 526 (Fla.1998) (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)), nor would it “probably yield a less severe sentence,” Henyard v. State, 992 So.2d 120, 125 (Fla.2008) (citing Jones v. State (Jones I), 591 So.2d 911, 915 (Fla.1991)).
I. SEXUAL BATTERY CONVICTION
The majority concludes that the newly discovered acid phosphatase tests give rise to a reasonable doubt as to Swafford’s culpability for the sexual battery because Medical Examiner Dr. Arthur Betting’s trial testimony, based on the 1982 acid phosphatase, tests, and the 1982 test results themselves were “the only evidence establishing the sexual battery.” Majority op. at 770. The majority cites Dr. Sot-ting’s trial testimony that the presence of acid phosphatase in the victim’s anus and vagina “absolutely establishes the presence of a male organ” and Florida Department of Law Enforcement (FDLE) analyst Keith Paul’s trial testimony acknowledging that the acid phosphatase test results were “positive proof that there has been a male organ at that place.” Majority op. at 769. Because Swafford cannot demonstrate that the newly discovered acid phosphatase test *780 results would likely result in an acquittal if he were retried for sexual battery, I would affirm the postconviction court’s denial of Swafford’s claim.
First, the evidence presented at the postconviction hearing did not demonstrate that the positive acid phosphatase test results introduced at Swafford’s trial were inaccurate. Rather, the postconviction evidence established that the vaginal and anal swabs collected in 1982 could not be reliably retested for acid phosphatase in 2004.
At the evidentiary hearing, Swafford called Charles Alan Keel, a forensic serologist at Forensic Science Associates, in an effort to establish that the samples collected from the victim were not too dated to successfully test for acid phosphatase and to discuss the significance of acid phosphatase testing. Keel initially testified that because acid phosphatase is “an exceedingly stable enzyme,” accurate acid phosphatase testing may still be possible decades after a sample is collected. Keel clarified, however, that the acid phosphatase enzyme is stable “[a]s long as it’s not subjected to extremes of heat or to moisture.” Keel explained that if the sample is exposed to heat or moisture, “bacteria can proliferate and literally eat” the acid phosphatase. Keel then admitted that he had no knowledge of how the samples collected in this case were stored. He testified that while he had an expectation that the samples would have been stored in a controlled environment, he “wouldn’t be surprised” if the samples had been “basically just shoved in a closet somewhere.”
Shawn Johnson, a DNA analyst for FDLE, testified that in 2004 he performed spot tests for acid phosphatase on the same vaginal and anal swabs that had been tested in 1982. Johnson stated that the results of the 2004 tests were negative. Johnson also stated, however, that he was not surprised by the inconsistent test results, given the state of the swabs when they were originally tested, the passage of time, and the minor variations that occur in the interpretation of acid phosphatase tests by different analysts. When asked if based on the positive acid phosphatase results in 1982, he would have expected to receive a positive test result in 2004, Johnson answered:
It wouldn’t surprise — it did not surprise me that I got — at the time, though, again, I did not know that it was positive [in 1982].
[[Image here]]
But looking back, I’m not surprised that it was negative, just because — and now knowing that they were in such bad condition when they originally were looked at, then I’m surprised that he even got that, that positive. And, again, his positive, if I looked at that positive, it could be my negative. You know what I’m saying, going back to that?
[[Image here]]
So, no, I’m not surprised that mine was negative.
When discussing vaginal swabs specifically, Johnson added,
It would be surprising if I did get a result. But, again, like I said, there’s no certainty in biological chemistry as far as through the time. Depending on the storage conditions, there’[re] so many variables. But in a typical — typically, I would expect not to get anything.
Johnson particularly expressed concern that when he received the swabs, they were sealed in plastic vials. Johnson explained that this method of storage can be problematic:
Well, being encased in plastic, it’s bad as far as moisture. If they were wet going in and then they’re sealed like that, then the bacteria is going to grow, and then it’s going to break down any *781 enzymatic activity that the [acid phosphatase] may have or — and long enough, it will break down the DNA to the point where no profile would be obtainable.
In light of this testimony, Swafford has not established that the negative test results in 2004 cast doubt on the reliability of the 1982 testing. Swafford did not provide any evidence that demonstrates that the vaginal and anal swabs were not properly tested in 1982 or any evidence that the swabs were properly dried and stored after that testing. To the contrary, at the evidentiary hearing, Paul testified that he could not remember if he dried the damp vaginal swabs before testing and resealing them, but since he took the evidence out of the refrigerator and returned it the same day, he suspected that he did not dry the swabs.
The majority emphasizes that the post-conviction court did not find that the 2004 testing was unreliable but ignores that the postconviction court also did not find that the 2004 testing was reliable. The majority’s assumption that the 2004 testing should be credited over the 1982 testing inverts the burden of proof regarding a newly discovered evidence claim.
Second, while the postconviction evidence indicates that when pushed on cross-examination, Paul and Dr. Botting may have overstated the significance of the positive acid phosphatase results, Swafford did not establish that the witnesses could be materially. impeached at the time of Swafford’s trial. Rather, the postconviction evidence supports the trial witnesses’ testimony that the 1982 positive acid phosphatase tests were strong evidence of the presence of seminal fluid in the tested orifices.
On direct examination during the guilt phase of Swafford’s trial, Paul testified that he conducted various tests on vaginal and anal swabs collected from the victim. Paul stated that the acid phosphatase tests were positive but that his testing for choline was negative and that when he used a microscope to look for sperm cells, none were present. Paul explained that due to the “sensitivity of the test” that he used to detect acid phosphatase, the positive test results were “a very strong indication that semen was present.” Paul then clarified that he “could not conclusively say that ... [the swabs] contained semen” because of the lack of sperm cells. On cross-examination, when asked if the presence of acid phosphatase was “positive proof that there has been a male organ” at the tested location, Paul answered “yes” due to the “particular test that [he] use[d].” Paul explained to the jury that while acid phosphatase is found in vaginal fluid, it is found in a much greater concentration in the male prostate gland.
The majority further asserts that on cross-examination, Dr. Botting declared the presence of acid phosphatase to be absolute proof of the presence of seminal fluid. The exact question posed to Dr. Botting, however, was whether there was an explanation other than sexual contact for the “the presence of prostatic acid phosphatase both in the anus and in the vaginal area orifice.” (Emphasis added.) This is an instance of an improper question, rather than an impeachable witness. Prostatic acid phosphatase — by definition — necessarily comes from a male body.
At the postconviction hearing, all three expert witnesses — Keel, Johnson, and Paul — testified that acid phosphatase testing is a presumptive, qualitative screening test for the presence of seminal fluid. They explained that because some acid phosphatase naturally occurs in the female body, additional tests are required to absolutely determine whether seminal fluid, which contains a greater concentration of acid phosphatase than generally occurs in *782 a female body, is present in the sample. But witnesses Johnson and Paul added that the qualitative acid phosphatase test used by FDLE does provide some quantitative information.
Johnson testified that the type of acid phosphatase test that was performed by FDLE technicians in both 1982 and 2004 not only detects the presence of acid phosphatase but gives an indication of whether the acid phosphatase is of a level normally associated with the female body or of a level more typical of seminal fluid. Johnson stated that when a sample is tested for acid phosphatase and the cutting from the swab changes color but the solution around it does not, that test result could be explained by vaginal acid phosphatase and may or may not be categorized as a weak “positive,” depending on the practice of the analyst conducting the test. But, Johnson explained, if the sample contains semen, the cutting will change color and “the solution is going to turn very, very dark purple,” an unambiguous positive result.
Similarly, when asked whether the acid phosphatase testing performed by FDLE in 1982 was qualitative or quantitative, Paul answered:
Primarily, qualitative. The test that we did was quantitative in the sense of, you’d have to have a certain level of it to get a positive test.
You know, for instance, acid phosphatase occurs in a lot of different things, blood cells, vaginal fluid, things like that. But this test was designed with a sensitivity that like vaginal acid phosphatase wouldn’t trigger a reaction within the protocols. So, I mean, you’d quantitate in that sense, but we didn’t do something like so many units per milliliter or anything like that, no.
He explained that the test was designed so that “something like normal vaginal acid phosphatase would not trigger anything” because if it did “then every swab we [got] would be positive.”
Considered as a whole, the postconviction testimony establishes that Paul and Dr. Botting should not have referred to a positive acid phosphatase test as absolute proof of the presence of seminal fluid. The postconviction evidence does not, however, establish that the witnesses erred in relying on the acid phosphatase tests to opine that seminal fluid was present in the victim’s vagina and anus. The postconviction testimony confirmed that the positive acid phosphatase tests were strong indicators of the presence of seminal fluid. Particularly given that the trial witnesses candidly informed the jury that no sperm cells were found on the swabs and Paul testified that the chemical test for choline was negative, the impact of the postconviction evidence on their credibility appears minimal.
Third, as explained by the postconviction court, even if the acid phosphatase evidence is ignored, there was evidence presented to the jury that the victim suffered physical injuries that were consistent with sexual battery. The jury heard Dr. Bot-ting’s testimony that the victim had superficial lacerations to her rectum and that the skin around the anus was covered in blood and Paul’s testimony that the anal swabs tested positive for blood. This evidence provides support for the conclusion that the victim had been sexually battered. Even if the blood on this area of the victim’s body could be attributed to the gunshot wounds she suffered, the only explanation in the record for the lacerations is sexual battery.
Indeed, without this evidence of physical injury, the acid phosphatase evidence would be as consistent with consensual sex as with nonconsensual sex. The acid phosphatase evidence thus was by no means the “linchpin” of the sexual battery case. Majority op. at 769. On the contrary, the *783 evidence of physical injury was the necessary foundation for the conclusion that a sexual battery occurred. Dr. Botting testified at trial that his physical examination of the lacerations to the victim’s rectum led him to believe that “[i]t was very probable” that the victim had been sexually battered “and for this reason swabs were made of the vaginal and anal orifices.” The majority’s suggestion that the acid phosphatase testing was essential to Dr. Botting’s expert opinion puts the cart before the horse.
Under Jones I and Jones II, Swafford has the burden to prove that the newly discovered evidence would likely result in an acquittal. Yet Swafford has not presented any evidence in any postconviction proceeding regarding this murder that undermines Dr. Botting’s conclusion that the rectal lacerations were caused by a sexual battery. To the contrary, defense witness Keel expressly stated, that while he disagreed with Dr. Botting’s testimony regarding the acid phosphatase testing, he “[o]f course” was “not commenting on [the rectal lacerations,] one way or the other.”
II. FIRST-DEGREE MURDER CONVICTION
I also agree with the postconviction court’s conclusion that the new evidence regarding the acid phosphatase testing does not undermine Swafford’s first-degree murder conviction. Because no sperm cells were found, no identifying DNA could be extracted from the swabs. The evidence thus did not connect any particular man to the crime. And conversely, because no identifying DNA evidence was extracted from the swabs in 2004, Swafford has not, as he claims, shown “that someone else sexually assaulted and murdered Ms. Rucker.” Initial Brief of Appellant at 43, Swafford v. State, SC10-1772 (Fla. filed Mar. 30, 2011).
The majority asserts that despite the lack of identifying DNA evidence, the sexual battery was relevant to the issue of whether Swafford was the killer due to witness Ernest Johnson’s testimony about an incriminating statement made by Swaf-ford. Johnson testified that one night in the spring of 1982, when he was socializing with Swafford, Swafford suggested that they could .get a woman, “do anything we want to [her,] and I’ll shoot her” and then added, “I’ll shoot her in the head twice and I’ll make damn good and sure that she’s, you know, she’s dead.” Johnson further testified that he asked Swafford if such actions would bother him, and Swafford replied: “[I]t does for a while, you know, you just get used to it.” The majority contends that because the newly discovered evidence undermines the State’s theory that the victim was sexually battered, Swafford’s statement would not be admissible.
Even if one accepts the majority’s unjustified premise that the sexual battery has been called into question, the majority’s conclusion is invalid. As explained by this Court on direct appeal, an admission by a defendant is admissible so long as its relevancy is not substantially outweighed by the danger of unfair prejudice. Swafford v. State, 533 So.2d 270, 273-75 (Fla.1988) (citing § 90.403, Fla. Stat. (1985)). Here, Swafford’s statement that “you just get used to it,” after discussing kidnapping and shooting a woman twice' in the head, tended to show that he had previously seized a woman ánd then shot her to avoid the legal consequences of his actions. The newly discovered acid phosphatase evidence does not negate the probative value of this admission. Whether the crime in Daytona Beach involved a sexual battery does not change the fact that the victim was shot — including two gunshots to the head — and that a short time later, Swaf- *784 ford implied that he had shot a woman in such a manner. Regarding prejudice, the majority does not explain how the admission is unfairly prejudicial, much less how the danger of unfair prejudice outweighs the probative value such that the admission would be excluded under section 90.403, Florida Statutes.
Furthermore, the State’s “entire case” was not built on the evidence pertaining to the sexual battery. Majority op. at 772. No biological evidence from the victim’s body linked Swafford to her murder. The State made its case against Swafford by presenting evidence establishing that Swafford had the opportunity to commit the kidnapping and murder during the early morning hours of February 14, 1982; that a .38 caliber firearm found at the Shingle Shack on February 14, 1982, was the weapon used to fire the bullets that killed the victim; that the murder weapon was stolen from a car in Nashville, Tennessee; that Swafford, who was from Nashville, disposed of a .38 caliber firearm at the Shingle Shack on that day; and that shortly after the murder Swafford made an incriminating statement suggesting that he had abducted and shot a woman. None of this evidence is affected by the 2004 retesting of vaginal and anal swabs.
I also disagree with the majority’s conclusion that were Swafford to be retried as a result of the newly discovered acid phosphatase evidence, he likely would be acquitted of the murder as a result of what the majority calls a “lack of evidence linking Swafford to the murder weapon,” majority op. at 775, and the evidence presented in a prior postconviction proceeding regarding James Michael Walsh.
The majority oversteps its role as an appellate court and becomes a fact-finder, improperly revisiting matters that were previously adjudicated. The majority thus concludes that the evidence at trial could establish that “the police did not seize the weapon belonging to Swafford.” Majority op. at 773. The majority emphasizes that while witness Karen Sarniak, a waitress at the Shingle Shack on February 14, 1982, testified that she saw Swafford place a gun in the trash can of the ladies’ restroom, witness Clark Griswold, a bouncer at the Shingle Shack at the relevant time, testified that on the evening of February 14, 1982, he retrieved a gun from the trash can of the men’s restroom and gave it to a law enforcement officer. The majority ignores, however, the fact that the jury was aware that one witness claimed to have retrieved the weapon from the men’s restroom but another witness claimed to have seen Swafford abandon his weapon in the ladies’ restroom.
The jury heard testimony from Sarniak and Griswold, and during closing argument, defense counsel raised the question of whether the Smith and Wesson gun with serial number J711503 that was recovered by the police at the Shingle Shack was really the gun seen in Swafford’s possession earlier on the night of February 14, 1982. Swafford’s counsel urged the jury to conclude that there was “another gun.” The jury also, however, heard Roger Harper — one of the men who traveled from Nashville with Swafford — testify that after drawing his gun on several individuals outside the Shingle Shack, Swafford put the gun in his jacket pocket and reentered the bar. Harper explained that moments later, when law enforcement officers arrived at the Shingle Shack, Swafford— still wearing his jacket — went to the men’s restroom. Harper further testified that on the way home to Nashville after Swafford was released from custody, Swafford was “mad” that he had “lost” his gun. Chan Hirtle, another of the group from Nashville, similarly testified that after brandishing his gun, Swafford put the gun in his *785 pants and then upon realizing that law enforcement officers were arriving at the bar, “r[a]n back inside” the Shingle Shack. A third member of the group, Carl H. Johnson, testified that he remembered Swafford had complained on the ride home that he had “lost” his gun. Finally, the jury heard Office Frank Iocco testify that only one gun was retrieved from the Shingle Shack on February 14,1982.
Since the jury reached a guilty verdict, the jurors necessarily resolved the discrepancy regarding disposal of the gun and determined beyond a reasonable doubt that the murder weapon was the gun “lost” by Swafford at the Shingle Shack. There is no legal basis for the majority to second-guess the jury’s determination on this issue three decades after the jury returned its verdict. The majority does not explain how the newly discovered evidence regarding acid phosphatase testing casts doubt on the jury’s weighing of the evidence regarding the murder weapon.
The majority also rejects — without explanation — the postconviction court’s conclusion that the evidence-presented during the evidentiary hearing on Swafford’s third postconviction motion did not raise material doubt about whether the gun recovered from a trash can in the Shingle Shack was placed there by Swafford. In that proceeding, the posteonviction court concluded that Michael Lestz’s testimony “contained many inconsistencies” and “would not have probably resulted in an acquittal given the strong case the state had against Mr. Swafford.” State v. Swafford, No. 83-03425CFAES (Fla. 7th Jud. Cir. Oct. 21, 1997).
The record contained competent, substantial evidence to support the postconviction court’s determination. The evidence presented at the hearing did not establish that Lestz was a reliable witness, that Walsh disposed of a gun at the Shingle Shack on February 14, 1982, or that Walsh would have reason to have possession of a gun that was known to have been stolen in Nashville, Tennessee-Swafford’s hometown.
Specifically, in his third postconviction motion, Swafford alleged that Lestz would testify, consistently with his affidavit, that on February 14, 1982, Walsh stated that he intended to get rid of two handguns and that Walsh went to the Shingle Shack that day. At the evidentiary hearing, Lestz testified that on February 14, 1982, Walsh asked Lestz to drive him around to various bars where Walsh hoped he could sell three guns, including two .38 caliber guns. Lestz did not offer any explanation of how or where Walsh acquired the firearms. Lestz went on to explain that he and Walsh went to two topless bars in the Daytona Beach area, but he could not remember the names of the bars. When asked about the Shingle-Shack, Lestz initially testified that he could not remember if they went to that bar on February 14, 1982. Lestz later testified-that they did stop at the Shingle Shack that evening but that he waited in the car, rather than going in with Walsh, and thus could not know whether Walsh disposed of a gun while in the bar. Throughout his testimony, Lestz repeatedly admitted that he did not in fact see Walsh dispose of any weapons in any bar on the date in question. Lestz also repeatedly admitted that he was not truthful .when initially interviewed by law enforcement officers.
Another witness at the evidentiary' hearing on Swafford’s third postconviction motion, Walter Levi, testified that he had observed Walsh steal guns from parked vehicles in the greater Daytona Beach and Orlando areas. Levi did not, however, testify about the acquisition of the particular guns Walsh possessed on February 14, 1982. And Captain Randall C. Burnsed of *786 the Volusia County Sheriffs Office testified that at one point in the homicide investigation, Lestz was a suspect and that when Lestz originally spoke to law enforcement officers about Walsh’s efforts to dispose of guns, Lestz claimed that Walsh met a man named Orlando Tony at Rudy’s Post-Time Lounge, not at the Shingle Shack.
Based on this record, the postconviction court considering Swafford’s third postcon-vietion motion did not err in concluding that Lestz’s testimony would not weaken the case against Swafford so as to create reasonable doubt about his culpability. The newly discovered evidence about the acid phosphatase testing does not in any way improve Lestz’s credibility or lead to the conclusion that Walsh abandoned a .38 caliber Smith and Wesson gun, registered to a man in Nashville, at the Shingle Shack on February 14, 1982. And even if in a new trial evidence about Walsh would be admissible, the jury would still be confronted with multiple witnesses establishing that Swafford brandished a gun at the Shingle Shack just moments before his arrest on February 14, 1982, and that only one gun was recovered from the bar that night.
III. DEATH SENTENCE
Finally, Swafford did not prove that the newly discovered acid phosphatase evidence would likely result in a lesser sentence on retrial. Because the newly discovered evidence would not result in Swafford being acquitted of sexual battery, the newly discovered evidence would not disrupt the trial court’s conclusions regarding the aggravating and mitigating factors cited in the sentencing order.
Furthermore — even accepting the implausible view that the new acid phosphatase evidence would undermine the trial court’s finding that the murder was committed while the defendant was engaged in a sexual battery and that the murder was heinous, atrocious, and cruel — the trial court did not rely on the sexual battery evidence when setting out the factual findings supporting three other aggravating factors: (1) Swafford had previously been convicted of a violent felony; (2) the crime was committed for the purpose of avoiding arrest; and (3) the crime was committed in a cold, calculated, and premeditated manner (CCP). State v. Swafford, No. 83-3425-BB (Fla. 7th Jud. Cir. Nov. 12,1985). This Court likewise did not rely on the sexual battery evidence when upholding the trial court’s conclusions regarding the avoiding arrest and CCP aggravating factors. See Swafford, 533 So.2d at 276-77.
In this case, the weighty aggravation is countered only by a single mitigating factor: that Swafford was an Eagle Scout. Given this balance of aggravation and mitigation, Swafford has not demonstrated that the newly discovered evidence — or the evidence regarding Walsh — would probably yield a less severe sentence on retrial as required by Jones I.
IV. SWAFFORD’S REMAINING POSTCONVICTION CLAIMS
The postconviction court’s denial of Swafford’s remaining postconviction claims likewise should be affirmed. In his second claim on appeal, Swafford asserted that the postconviction'Court erred by not allowing additional testing of certain DNA evidence by Forensic Science Associates, the lab of Swafford’s choice. Swafford raised this claim in a prior postconviction proceeding, and it was found to be without merit. Swafford v. State, 946 So.2d 1060, 1061 (Fla.2006). As a result, the claim is now proeedurally barred.
In his third claim on appeal, Swafford contends that the postconviction court erred by denying him an evidentiary hear *787 ing regarding the inconclusive DNA test results from scrapings of the victim’s fingernails, DNA from a hair found on the victim’s panties, DNA from a hair found on a towel at the crime scene, and a mixture of DNA on a hair follicle. Swafford asserts that both he and the victim could be excluded as contributors of the DNA found on those items and that he was wrongly-denied the opportunity to present evidence that the samples analyzed at FDLE’s lab may have been contaminated. The post-conviction court did not err in denying Swafford’s request for an evidentiary hearing. This Court “will uphold the summary denial of a newly-diseovered-evidence claim if the motion is legally insufficient or its allegations are conclusively refuted by the record.” Ventura v. State, 2 So.3d 194, 198 (Fla.2009). Here, Swafford’s motion is legally insufficient. The State did not rely on the fingernail scrapings or hairs to convict Swafford, and Swafford failed to explain how additional evidence could render meaningful the inconclusive DNA test results from the scrapings or how additional evidence about the hairs could exonerate him. Even if Swafford’s allegations about the shortcomings of FDLE’s DNA practices could be proven, the newly discovered evidence would neither “weaken! ] the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability,” Jones II, 709 So.2d at 526, nor would it “probably yield a less severe sentence,” Henyard, 992 So.2d at 125. Thus, Swafford did not assert a legally sufficient claim based on newly discovered evidence.
Y. CONCLUSION
I would affirm the postconviction court’s order denying relief. The newly discovered evidence regarding the acid phosphatase testing does nothing to weaken the case against Swafford. There is no basis for vacating his convictions and sentences and ordering a new trial more than thirty years after the crimes occurred. Therefore, I dissent.
POLSTON, C.J., concurs.